22CA0371 Peo v Whitehorn 03-27-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA0371
City and County of Denver District Court No. 19CR116
Honorable Ericka F.H. Englert, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Byron L. Whitehorn,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE JOHNSON
Lipinsky and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 27, 2025

---

Philip J. Weiser, Attorney General, William G. Kozeliski, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Mackenzie R. Shields, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1      Defendant, Byron L. Whitehorn (Whitehorn), appeals the judgment of conviction entered on jury verdicts finding him guilty of eight counts of sexual assault involving four victims.  On appeal, Whitehorn contends that the district court erred by (1) allowing the prosecutor to engage in misconduct when she linked Whitehorn's right to remain silent with the jury asking itself why Whitehorn had been in lower downtown Denver (LoDo) — the location of the assaults — at night; (2) admitting his Uber driving records from two years before he was charged; (3) permitting the victims to testify about the impact of the assaults; and (4) allowing the initial investigating officers to testify about their screening process for sexual assault cases because that testimony suggested he was guilty.  He also alleges cumulative error.  We discern no reversible errors and, thus, affirm.

## I.      Background

¶ 2      Four women, who had never previously met Whitehorn or each other, accused him of sexual assault in four separate incidents between April 2017 and December 2018.  All four victims — L.L., T.M., N.H., and P.D. — had been drinking with friends at bars located in LoDo on the nights of the incidents.  The victims had

become separated from their friends or wanted to return home early and were waiting on the street for an Uber. The victims testified that they were very intoxicated and a man picked them up and took them to his car. They each passed out while in the car and had memories of waking up while a man was sexually assaulting them. The women underwent sexual assault examinations and DNA samples were taken from all the victims.

¶ 3    Before P.D.'s assault, which was the last of the assaults with which Whitehorn was charged, no suspect or suspects had been identified in connection with the other three victims. During an examination of P.D.'s phone, law enforcement located the name "Byron" and a phone number that had been entered around the time of P.D.'s sexual assault. P.D. did not recognize the name or the number. The phone number was not associated with a cell phone account, so the police left a voicemail. Eventually Whitehorn called back from a different number and the police asked him to come to the station to provide a saliva sample. Based on the caller identification number associated with Whitehorn's call, law enforcement discovered that a car registered to Whitehorn matched the four victims' description of the vehicle that the person who

sexually assaulted them had driven. Whitehorn provided a saliva sample that was later matched to the DNA samples taken during the victims' examinations.

¶ 4 The prosecution charged Whitehorn with eight counts of sexual assault — for each victim, one count of sexual assault (submission against will), § 18-3-402(1)(a), C.R.S. 2018,[1] and one count of sexual assault (victim incapable of appraising nature of conduct), § 18-3-402(1)(b), both of which are class 4 felonies, § 18-3-402(2). Whitehorn's theory of defense was that he believed the sexual intercourse with the four women was consensual, following random encounters at bars in LoDo.

¶ 5 The jury convicted Whitehorn as charged. The district court merged the four incapable of appraising conduct counts into the four overcoming the victim's will counts and sentenced him to four consecutive sentences of six years to life in the custody of the

---

[1] The definition of sexual assault in section 18-3-402(1)(a) was amended in 2022. Ch. 41, sec. 1, § 18-3-402, 2022 Colo. Sess. Laws 214. The prior version of the statute was in effect at the time of the events at issue in this case; therefore, we apply the 2018 version of section 18-3-402 throughout this opinion.

Department of Corrections for a controlling sentence of twenty-four years to life.

## II. Prosecutorial Misconduct

¶ 6 Whitehorn contends that the prosecutor engaged in misconduct when she asserted during rebuttal closing that the jury could ask itself why Whitehorn was in LoDo even though he had invoked his right to remain silent. We agree that the prosecutor's statement was improper. But we conclude that the statement was harmless beyond a reasonable doubt.

### A. Standard of Review

¶ 7 We engage in a two-step analysis when reviewing prosecutorial misconduct claims. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). "First, [we] determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances." *Id.* Second, we decide "whether such actions warrant reversal according to the proper standard of review." *Id.*

### B. The Prosecutor Engaged in Misconduct

¶ 8 During rebuttal, the prosecutor said the following:

> [W]hen you go back into that jury room you
> are instructed to take all of this evidence that

you've heard and consider it in light of your own experiences in life.

So let's talk about that. Right. We as human beings understand certain patterns of behavior, certain experiences. What's really critical about that is when you think about who this person is, this is a man who was fifty years old, nearly twice the age of each and every single one of these women, who is married, young kids, and *while he has the absolute right to remain silent, that doesn't mean that when you go back into that jury room, does that mean you can't ask yourself what is he doing there*?

(Emphasis added.) Whitehorn contends that the prosecutor's statement suggested that, without an explanation as to "what [he was] doing there," the jury could use his silence to infer he was guilty. Defense counsel objected, arguing that the statement was an inappropriate comment on Whitehorn's constitutional right to remain silent. Although the court cautioned the prosecutor, it overruled defense counsel's objection.

¶ 9 We conclude that the court erroneously allowed the prosecutor to engage in misconduct by not striking the statement. It is axiomatic that a prosecutor may not argue that a "defendant's silence implies that he or she is guilty." *People v. Gibson,* 203 P.3d 571, 577 (Colo. App. 2008); *see also Dunlap v. People,* 173 P.3d

5

1054, 1080 (Colo. 2007) (the prosecution may not urge the jury to use a defendant's exercise of the right to remain silent to infer guilt). Thus, we conclude the prosecutor's comment is problematic for four reasons.

¶ 10    First, the prosecutor's comment told the jury that Whitehorn was married with children, when there was no testimony before the jury about Whitehorn having kids. There had been testimony that Whitehorn's wife owned the vehicle that Whitehorn drove on the nights of certain of the assaults. But the only reference we see in the record to Whitehorn having children is defense counsel's offer of proof, made outside the presence of the jury, that, if Whitehorn were to testify, he would say one of the victims had not been upset about having sex with him until she saw a picture of his children in his home. *See People v. Nardine*, 2016 COA 85, ¶ 59 (a prosecutor should not refer to facts not in evidence); *see also People v. McMinn*, 2013 COA 94, ¶ 62 (same).

¶ 11    Second, the prosecutor linked Whitehorn's right to remain silent with a lack of explanation for why he might have been "there" — meaning she wanted the jury to use its common sense and ask itself why a man who was married with young children was trolling

6

LoDo, where the assailant picked up the victims, instead of being at home with his family.  True, the prosecutor did not say that the jury could use Whitehorn's silence to convict him.  But the statement sought to equate his silence with an inference that he was guilty.  In other words, because he did not testify regarding the reason for his presence in the area, the jury could — and should — infer the worst.  *See Gibson*, 203 P.3d at 577 (The test "for whether a prosecutor's argument constitutes a comment on the defendant's failure to testify is whether the comment directs the jury's attention to the defendant's silence as a means of implying guilt.").

¶ 12　　Third, the comment was unnecessary.  "[B]ecause arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful." *People v. Samson*, 2012 COA 167, ¶ 30.  But in our view, this was not simply misspeaking or inartful phrasing.  A prosecutor has latitude to present arguments based on facts in evidence, ask the jury to make reasonable inferences drawn from those facts, and respond to the defendant's arguments.  *People v. Maloy*, 2020 COA 71, ¶ 61.  The prosecutor could have made her point without referring at all to

7

Whitehorn's right to remain silent. Specifically, the prosecutor could have posed the questions: Why was Whitehorn in the area when married? Should he not be at home with them?

¶ 13    Finally, this is not a situation in which defense counsel opened the door in closing argument so that the prosecutor was entitled to respond in kind during rebuttal closing. *See People v. Lovato*, 2014 COA 113, ¶ 63 ("In considering whether prosecutorial remarks are improper, the reviewing court must weigh the effect of those remarks on the trial, and also take into account defense counsel's 'opening salvo.'") (citation omitted). We see nothing in defense counsel's closing argument as an "opening salvo" on Whitehorn's right to remain silent.

¶ 14    Nor was this a situation in which the prosecutor was referring to questions that Whitehorn had refused to answer or had answered by leaving out material information when talking with police. For example, a prosecutor may comment that a defendant spoke at length to police but did not discuss or disclose certain information. *See People v. Lewis*, 2017 COA 147, ¶ 36; *see also Berghuis v. Thompkins*, 560 U.S. 370, 388-89 (2010) ("[A] suspect who has received and understood the *Miranda* warnings, and has not

invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police."); *cf. People v. Quintana,* 665 P.2d 605, 611 n.7 (Colo. 1983) ("The failure to make any statement should be distinguished from the situation where an accused does make a statement to law enforcement officials but the statement omits significant details which are later included in a subsequent statement. In the latter situation the accused has not elected to remain silent, but instead has waived that right and made a statement.").

C.    The Error Was Harmless Beyond a Reasonable Doubt

¶ 15    Although we conclude the court allowed the prosecutor to engage in misconduct, we conclude the error was harmless beyond a reasonable doubt.

¶ 16    "Only those errors 'that specifically and directly offend a defendant's constitutional rights are "constitutional" in nature.'" *People v. Flockhart,* 2013 CO 42, ¶ 20 (quoting *Wend,* 235 P.3d at 1097); *see People v. Payne,* 2019 COA 167, ¶ 30. This includes an "impermissible comment on a defendant's exercise of a specific constitutional right, such as his right not to testify, his right to be

9

tried by a jury, or his right to post-arrest silence." *Wend*, 235 P.3d at 1097 (quoting *Crider v. People*, 186 P.3d 39, 42 (Colo. 2008)).

¶ 17 Under constitutional harmless error review, the prosecution bears the burden of proving that the error was harmless beyond a reasonable doubt. *Hagos v. People*, 2012 CO 63, ¶ 11. "An error is not harmless beyond a reasonable doubt '[i]f there is a reasonable possibility that the defendant could have been prejudiced.'" *People v. Castro*, 2022 COA 101, ¶ 39 (quoting *People v. Stroud*, 2014 COA 58, ¶ 6). In other words, the harmless error analysis focuses on "'whether the guilty verdict actually rendered in this trial was surely unattributable to the error,' and 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered.'" *People v. Phillips*, 2012 COA 176, ¶ 93 (quoting *People v. Fry*, 92 P.3d 970, 980 (Colo. 2004)).

¶ 18 In assessing whether we should reverse a conviction due to prosecutorial misconduct, we look at "the language used, the context of the statements, the strength of the evidence, whether the prosecutor improperly appealed to the jurors' sentiments, whether the misconduct was repeated, and any other relevant factors." *People v. Liebler*, 2022 COA 21, ¶ 51.

¶ 19    We conclude that the error was harmless beyond a reasonable doubt for three reasons.

¶ 20    First, the comment was brief and not repeated. *People v. Cuellar*, 2023 COA 20, ¶ 51 (the prosecutor's improper statements during closing argument were harmless due to the brief nature of the argument and the fact that the prosecutor did not repeat those improper statements); *People v. Vialpando*, 2022 CO 28, ¶ 41 (same).

¶ 21    Second, the jury was properly instructed on Whitehorn's right to remain silent and that such silence could not be used to infer his guilt. And without evidence in the record to the contrary, we must presume the jury followed the court's instructions. *See Galvan v. People*, 2020 CO 82, ¶ 29; *People v. Snelling*, 2022 COA 116M, ¶ 22.

¶ 22    Finally, the evidence against Whitehorn was overwhelming. Whitehorn disagrees, contending that this case rests solely on witness credibility. While it is true that the victims' credibility was at issue, as discussed next, his argument fails to consider the pattern of how the victims came to be in Whitehorn's car, the victims' similar testimony about the sexual assaults, the corroborating testimony from the victims' friends and family, the

physical evidence of nonconsensual sex, and the evidence supporting Whitehorn's consciousness of guilt.

### 1. The Pattern of Whitehorn Picking up the Victims

¶ 23    Whitehorn picked up all of the very intoxicated victims in LoDo.

¶ 24    At trial, L.L. testified that in April 2017, she had gone to brunch and a Rockies game with friends, drank throughout the day and evening, and got separated from her friends at the end of the evening. Her cell phone had died so she could not call a rideshare.

¶ 25    The second victim, T.M., testified that, in October 2017, she was visiting a friend in Denver. They went out to bars in LoDo. While at one bar, T.M. was separated from her friend, who went to get them more drinks. Because T.M. could not find her friend, she went outside. T.M.'s phone was dead, which prompted her to ask strangers outside the bar for assistance. After speaking with some strangers, a man approached her. Despite not remembering the specifics, she walked with the man down the street alone.

¶ 26    The third victim, N.H., testified that in January 2018, she drove with friends from Boulder to Denver to stay with a friend. Before going out with her friends, she took shots of tequila and

12

consumed some cocaine.  N.H. and her friends went drinking in LoDo.  At some point during the night, she went outside the bar to call an Uber to take her home.  Before calling the Uber, she video-called a friend, when suddenly a man N.H. later identified as Whitehorn approached her.  She remembered that he offered her a ride home and being inside his car.

¶ 27 And P.D. testified that in December 2018, she went out with friends to bars in LoDo.  At some point during the night, P.D. decided she wanted to leave.  Her friend wanted to stay at the bar, so P.D. called an Uber to take her home.  When P.D. went outside, P.D. was approached by a man who offered to help her.  He grabbed her phone and cancelled the Uber.  P.D. then walked with the man, eventually passing out in his car.

2.    The Similarity of the Victims' Testimony

¶ 28 Once in the car, the victims also had similar testimony about what occurred.

¶ 29 L.L. testified she was so intoxicated that her next memory after wanting to go home was waking up in the back of a car in a fetal position.  She did not recognize the car or the man.  The man asked her to move to the front seat and told her he would take her

13

home. She gave him her address and moved up to the front seat. She then remembered the man being on top of her, having sex with her in the car.

¶ 30    After encountering her assailant, T.M. remembered entering another bar and having a beer with him. She did not remember where her friend's house was and did not remember agreeing to go to the man's house, but they went to his house anyway. She remembered vomiting in the man's car while driving there. But T.M. could not remember what happened after she went inside the man's house; she only faintly recalled the layout of the house and the bedroom window, as well as vomiting again in the bathroom. Her next memory was being on the man's bed with her pants down and the man on top of her having sex. She asked him to stop, which he did. T.M. then got dressed, gave the man her friend's home address, and asked him to take her there.

¶ 31    While in the man's car, N.H. remembered having a confusing conversation in which he claimed to know her boyfriend. N.H.'s next memory was the man on top of her, having sex with her, in the passenger seat of the car. She did not recall consenting. Her next memory was waking up in Boulder.

¶ 32   Once in the car, P.D.'s next memory was the man being on top of her, having sex with her, in the passenger seat. Her underwear was torn. She recalled the sex being "really gross" and that she "wanted it to stop." She said that she waited for it to end.

### 3.   Corroborating Testimony of Friends

¶ 33   Some of the victims' friends testified that the victims told them about the sexual assaults immediately after they occurred.

¶ 34   L.L. told a friend what she remembered about the night, including that she thought she was raped but was not sure. Encouraged by her friend, on that same night, she went to a hospital and underwent a sexual assault nurse examiner (SANE) exam.

¶ 35   After the man drove T.M. back to her friend's house in Denver, she went to bed. The next morning, T.M. told her friend her recollection of the prior night, including that she believed she had been raped. After urging T.M. to get checked out, her friend took her to a hospital where she was examined by a SANE and recounted her experience.

¶ 36   While N.H. was in the man's car, her friends were looking for her. They used a tracking app on N.H.'s cell phone, noticing she

was heading back to Boulder.  One of her friends went to N.H.'s house to wait for her.  Her friend recalled a white car pulling up to the home.  N.H.'s friend opened the car door, saw N.H. texting on her phone and get out of the passenger seat, and realized something was off.  The next morning, N.H.'s friends insisted she go to a hospital.  Although reluctant to do so, she went and was examined.

### 4. Evidence of Nonconsensual Sex

¶ 37    L.L. remembered that, when she awoke to her assailant having sex with her, she was disconcerted because she was menstruating and was using a tampon.  She told the man she was on her period and asked him to get off her, which he did.  Once L.L. realized they were parked near her house, she asked the man to take her home.  He dropped her off and gave her his number.

¶ 38    During L.L.'s examination, the SANE noticed a genital tear but did not find a tampon.  The SANE also observed a bruise on L.L.'s elbow.  L.L. continued to experience pain in her genital area for an extended period of time.  She sought treatment approximately six weeks later, when a doctor finally discovered the tampon, and it was removed.

¶ 39 During N.H.'s examination, the SANE observed discharge from her nipple ring, multiple diffused bruises on her lower legs, a small bruise on her back leg, and tenderness to her lower back and left arm.

¶ 40 P.D. testified there was a tear on the underwear she wore on the day of the sexual assault and that she would not have put on torn underwear.

### 5. Evidence of Whitehorn's Consciousness of Guilt

¶ 41 Detective Loretta Beauvais (Beauvais), who investigated P.D.'s case, testified that she located in P.D.'s cell phone a phone number under the name "Byron" that had been entered into P.D.'s phone around the time of the assault. Beauvais recounted that, after she called the number and no one answered, she left a voicemail to an inbox identified as "Byron." She further stated that the number in P.D.'s phone was associated with a Voice Over Internet Protocol number, which meant there was no subscriber information for tracing purposes, and that such a service could be purchased for any type of business.

¶ 42 Whitehorn returned Beauvais's call from a different cell phone number, which she testified was then traced back to him. After

17

Whitehorn returned the call to police and gave his saliva sample, he deactivated his cell phone account that same day.  The following day, he got a new phone.  *See People v. Perry*, 68 P.3d 472, 475 (Colo. App. 2002) (holding that evidence of a defendant's flight might be relevant to show consciousness of guilt, but only if the defendant was aware that the police were searching for him).

¶ 43     Given the overwhelming evidence presented in this case linking Whithorn to each victim's assault, and the brevity of the prosecutor's comment in rebuttal about Whitehorn's right to remain silent, we conclude that the error was harmless beyond a reasonable doubt.

III.    Admission of Whitehorn's Uber Records

¶ 44     Whitehorn contends that the district court erred by admitting his Uber records from when he drove for the company in 2015, two years before any charged conduct occurred.  He argues that the records created the inference that he (1) utilized his time as an Uber driver to scheme the sexual assaults in this case and (2) had sexually assaulted women before 2017.  On appeal, Whitehorn asserts the evidence was subject to the requirements of CRE 404(b),

and the court erred by failing to undertake an analysis required by *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990). We disagree.

## A. Additional Facts

¶ 45     At trial, Whitehorn's defense counsel moved to exclude his Uber driving records. These records included approximately eighty-eight trip receipts, sixty-five percent of which were for trips in the LoDo area.

¶ 46     Outside the presence of the jury, the prosecutor argued that the records were relevant to establish Whitehorn had previously, and frequently, been at locations near where the victims had been picked up. The prosecutor further asserted that the records were relevant to show that Whitehorn "had the *opportunity to observe* this part of downtown and *know exactly what's going on down there*, i.e., women who are alone and out on the streets." (Emphasis added.) Defense counsel objected to admission of the Uber records, arguing they were irrelevant under CRE 401 and 403.

¶ 47     The district court allowed admission of the records:

> Based on the offer of proof of the People and the arguments I've heard, the Court finds that the Uber records from 2015 that demonstrate that Mr. Whitehorn was in the area of these alleged incidents with some frequency,

possibly up to 65 percent of the total rides that he drove for Uber, the Court finds is *relevant in this case to Mr. Whitehorn's ability to observe the area, to have knowledge of the streets in the area, and possibly also to observe the – the manner in which people, women or otherwise, conducted themselves at the time – around the time that bars were let out* is admissible in this case, and the motion in limine is denied.

(Emphasis added.)

### B. Standard of Review and Applicable Law

¶ 48 The district court's decision to admit evidence under CRE 404(b) is reviewed for an abuse of discretion. *Yusem v. People*, 210 P.3d 458, 463 (Colo. 2009). A court abuses its discretion in this context when its ruling is manifestly arbitrary, unreasonable, or unfair, or is based on a misunderstanding or misapplication of the law. *People v. Heredia-Cobos*, 2017 COA 130, ¶ 6.

¶ 49 Evidence of a defendant's other crimes, wrongs, or acts is not admissible to prove the defendant's bad character or propensity to commit crimes. CRE 404(b). The rule, however, allows for admission of such evidence for some other relevant purpose, such as to prove common plan, scheme, or design. *Yusem*, 210 P.3d at 463; *Adrian v. People*, 770 P.2d 1243, 1244 (Colo. 1989). The

20

"prosecution must identify the specific purpose for which the evidence will be used."  *Yusem*, 210 P.3d at 464.

¶ 50    Before admitting other act evidence, the district court must be satisfied by a preponderance of the evidence that the other act occurred and that the defendant committed it.  CRE 104; *People v. Rath*, 44 P.3d 1033, 1039 (Colo. 2002).  Next, the district court must find that (1) the proffered evidence relates to a material fact; (2) the evidence is logically relevant; (3) the logical relevance is independent of any inference that the defendant has a bad character; and (4) the danger of unfair prejudice does not substantially outweigh the probative value of the evidence.  *Spoto*, 795 P.2d at 1318.

## C.    Analysis

¶ 51    We conclude for four reasons that the district court did not err by admitting Whitehorn's Uber driving records.

¶ 52    First, Whitehorn mistakenly asserts on appeal that, because the Uber driving records are extrinsic evidence, a CRE 404(b) analysis should have been undertaken by the court.  Whitehorn relies on *Rojas v. People*, 2022 CO 8, ¶¶ 36-41.  In that case, our supreme court abolished the doctrine of res gestate and held that

21

courts must analyze whether other act evidence is intrinsic or extrinsic to the offense. *Id.* In other words, Whitehorn maintains that, under *Rojas*, the drives documented in the Uber records did not occur contemporaneously with the charged offenses and did not facilitate the commission of the offenses, and, thus, the evidence is extrinsic and subject to a Rule 404(b) analysis.

¶ 53 But as the Attorney General correctly asserts, while the driving records are extrinsic to the charged offense, they do not implicate character or a "bad act" because no charges or knowledge of bad acts existed in 2015 when Whitehorn drove for Uber. We agree that a Rule 404(b) analysis was not required. *See Rojas*, ¶ 52 ("[I]f extrinsic evidence does not suggest bad character, Rule 404(b) does not apply and admissibility is governed by Rules 401-403."); *see also Burkins v. State*, 219 N.E.3d 735, 749 (Ind. Ct. App. 2023) (a person stating their feelings is not considered a bad act); *Commonwealth v. Dula*, 262 A.3d 609, 632 (Pa. Super. Ct. 2021) (holding that a defendant's "odd work behavior" did not constitute a bad act for purposes of Rule 404(b), so the question was whether the evidence was relevant).

¶ 54 Second, and related to the first reason, Whitehorn's contention that the court did not provide a limiting instruction is irrelevant. The court's admission of the records under CRE 401 and 403 did not require such an instruction and Whitehorn did not ask for one. *See People v. Griffin*, 224 P.3d 292, 298-99 (Colo. App. 2009) (holding that defense counsel is charged with the task of deciding whether a limiting instruction is desirable, and the court must give a limiting instruction "upon request" (quoting CRE 105)); *see People v. Garcia*, 981 P.2d 214, 217 (Colo. App. 1998) (there may be strategic or tactical reasons for a defendant's choice not to request a limiting instruction, and the court is not required to provide one sua sponte).

¶ 55 Third, even assuming that a Rule 404(b) analysis was required, the records satisfy the four-part *Spoto* test. *See People v. Draper*, 2021 COA 120, ¶ 85 n.10 (A district court's "decision to admit evidence may be defended by any ground supported by the record, even if that ground was not considered by the trial court."), *overruled by Garcia v. People*, 2023 CO 30. The records relate to material facts — they showed that Whitehorn had knowledge of

LoDo and an opportunity to observe which areas people frequented and how women conducted themselves when bars were closing.

¶ 56 Although this prior knowledge of and familiarity with the area where the victims were picked up are not directly related to proving "motive, opportunity, intent, preparation, plan, . . . or absence of mistake or accident," they are material facts regarding the sexual assaults because they are "intermediate or evidential facts [that are] probative of ultimate facts." *Rath*, 44 P.3d at 1039-40; *see also Vialpando v. People*, 727 P.2d 1090, 1095 (Colo. 1986) ("[A] 'fact of consequence to the determination of the action' also includes facts bearing circumstantially upon the weight or probative value to be given other evidence in the case." (quoting Michael H. Graham, *Handbook of Federal Evidence* § 401.1, at 151-52 (2d ed. 1986))). The victims' testimony established that the assaults occurred in a similar manner: Whitehorn approached them outside bars while they were intoxicated and alone in areas in which Whitehorn previously often drove for Uber.

¶ 57 The Uber records were also logically relevant to establish Whitehorn's familiarity with the location and observation of people's activities. An investigator on the case testified that Whitehorn's

24

experience as an Uber driver for approximately two years included 176 locations, 107 of which were in LoDo near the bars in question, during late night hours.

¶ 58    The evidence was also independent of any inference that Whitehorn had a bad character because there is nothing inherently improper about being an Uber driver; rather, the location, timing, and frequency of Whitehorn's Uber trips were the relevant facts. Thus, we conclude that Whitehorn's Uber records satisfy the third and fourth *Spoto* prongs.

¶ 59    Fourth and finally, we disagree with Whitehorn that the probative value of the Uber records was outweighed by the prejudice of their admission. At no time did the prosecution use the evidence to suggest Whitehorn was "hatching" a plan to sexually assault women during his tenure with Uber in 2015. Accordingly, because the district court appropriately exercised its discretion to determine relevancy, we will not disturb the court's admission of the records under CRE 401 and 403. *See People v. Rodriguez*, 209 P.3d 1151, 1160-61 (Colo. App. 2008).

¶ 60    Accordingly, we perceive no reversible error in the admission of the Uber records.

## IV.   The Witnesses' Victim Impact Testimony and the Evidence of Screening

¶ 61    Whitehorn next contends that the district court improperly (1) allowed victim impact testimony and (2) permitted officers to testify about their screening process to imply Whitehorn's guilt.  We discern no error.

### A.    Standard of Review

¶ 62    As noted above, we review a court's evidentiary rulings for an abuse of discretion.

### B.    Victim Impact Testimony

¶ 63    Whitehorn argues that the extensive testimony of the victims and their friends about the psychological and emotional effects of the assaults was irrelevant impact evidence and was unfairly prejudicial because it improperly shifted the jury's focus from deciding whether Whitehorn committed the crime to imposing a guilty verdict out of sympathy.  We disagree.

#### 1.    Additional Facts

¶ 64    During direct examination, the prosecutor asked L.L. whether she had moved following the sexual assault.  She responded that she had moved "three weeks later," that it was not her original plan to move at that time, and that she moved because of the incident

involving Whitehorn.  On redirect, L.L. was asked how she felt "in the days following" the incident relating to not wanting to cooperate with the investigation, and she responded that she felt "very anxious" and "scared," and was worried that "someone would come after me for doing something."

¶ 65     During P.D.'s cross-examination, defense counsel asked her "in those hours the next day after" the incident, "are you trying to put the pieces back together to figure out how this happened?" P.D. responded that she felt "numb."  Defense counsel then asked, "Has this been a persistent part of your life since this occurred back in 2018?"  P.D. responded, "It has ruined my life."

¶ 66     P.D.'s boyfriend at the time of her assault testified that P.D. texted him the night of the incident that she had just been "sexually assaulted."  He went to her apartment and described her as sobbing and "very broken down."  He also testified that P.D. did not like physical contact for one or two months after the incident.

¶ 67     P.D.'s friend H.C. also testified that she was at P.D.'s apartment the night of the incident.  H.C. described P.D. as "very shaken" for several days and said she was very quiet and had nightmares.  H.C. said that it was an "intense couple of months"

when she and P.D. would just sit together.  H.C. recounted that she altered her work schedule so she could be home more so P.D. did not have to be home alone, and that P.D. was tired and would sometimes cry.

¶ 68     N.H.'s roommate, S.R., testified that in the days after the assault N.H. was not in a "good place" and was withdrawn and would not come out of her room.

¶ 69     In closing argument, the prosecutor mentioned some of this testimony:

> These are not women who simply regretted a one-night stand, *you can see the way that this has impacted them from their demeanor on the stand, the fact that they sought therapy.*  They moved from their houses or had issues with relationships.  This is not simply a regretting of one night.  *Each one of them, in the moment, realized they did not consent to this.*

(Emphasis added.)

¶ 70     In rebuttal, the prosecutor also said:

> When you look at these four women, when you think back to meeting each and every one of them on that witness stand, when you think about their testimony, *when you think about the way his actions have impacted them and how visceral that was for each and every one of these women – [N.H.], she couldn't even look over here.  She was curled up, turned in that*

> *direction. That's what happened to these*
> *women as a result of this man's intentional*
> *actions.*

(Emphasis added.)

### 2. Analysis

¶ 71 Whitehorn contends that testimony of the victims and their friends, as well as the prosecutor's statements during rebuttal closing, directed the jury to consider the victims' trauma, resulting in the jury convicting Whitehorn based on sympathy rather than on a consideration of whether he committed the charged offenses. Assuming, without deciding, that the testimony Whitehorn challenges is victim impact evidence, it was relevant and not unduly prejudicial. Therefore, we discern no error.

¶ 72 Victim impact evidence is evidence that relates to "the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family." *People v. Martinez*, 2020 COA 141, ¶ 29 (quoting *Schreibvogel v. State*, 2010 WY 45, ¶ 22); *see State v. Graham*, 650 S.E.2d 639, 645 (N.C. Ct. App. 2007) (explaining that victim impact evidence includes the physical, psychological, emotional, and economic toll a crime takes on the victim and the victim's family).

¶ 73    Whitehorn relies on *Martinez*, ¶¶ 2-3, 33, in which the division held, under the facts of that case, that a mother's testimony about her daughter being depressed and suicidal was improper victim impact testimony because it did not make it more probable that the victim had been sexually assaulted. But *Martinez* is distinguishable.

¶ 74    The defendant in *Martinez* was charged with sexual assault (incapable of appraising nature of conduct), § 18-3-402(1)(b). *Martinez*, ¶ 10. That offense involves a victim who cannot understand what she is doing. *People v. Lancaster*, 2022 COA 82, ¶ 17. Therefore, the offense "focuses on the actor's awareness of the victim's *cognitive* incapability of appraising the nature of his or her own conduct." *People v. Platt*, 170 P.3d 802, 805 (Colo. App. 2007), *aff'd*, 201 P.3d 545 (Colo. 2009). The focus of the analysis in *Martinez* was whether the victim "was so heavily intoxicated that she was incapable of apprising the nature of her conduct, and, thus, she could not and did not consent to have sex" with the defendant. *Martinez*, ¶¶ 5, 38.

¶ 75    The division concluded that the victim impact testimony was not "relevant to any material fact," such as the defendant's state of

mind or why the victim could not remember certain events from the night. *Id.* at ¶ 40. "[T]he evidence did not shed light on why the victim could not remember anything between 9:00 p.m., when she was still at the bar, and when she found herself lying on the ground at a light-rail station hours later." *Id.* In other words, whether the victim was depressed or suicidal after the assault did not make it more likely than not that she was intoxicated at the time of the incident.

¶ 76 Whitehorn was charged with and convicted of sexual assault under section 18-3-402(1)(b). But he was also charged with and convicted of sexual assault under section 18-3-402(1)(a) (submission against will). At the time of his conviction, section 18-3-402(1)(a), C.R.S. 2018, stated that a person who knowingly inflicts sexual intrusion or sexual penetration commits sexual assault when the person "causes submission of the victim by means of sufficient consequence reasonably calculated to cause

submission against the victim's will."[2]  In other words, the central focus of this offense is whether the sexual act was against the victim's will, meaning she did not consent.

¶ 77     Victim impact testimony is generally irrelevant in the guilt/innocence phase of a trial because "the effect of a crime on a [victim or the] victim's family often has no tendency to prove whether a particular defendant committed a particular criminal act against a particular victim." *Martinez*, ¶ 33 (quoting *Graham*, 650 S.E.2d at 645).  Thus, admissibility of victim impact evidence turns on whether the evidence is relevant to determining whether the defendant committed the charged offense.  *Id.* (citing *Schreibvogel*, ¶ 22); see also CRE 402 (irrelevant evidence is inadmissible); *People v. Clark*, 2015 COA 44, ¶ 17 ("In criminal cases, evidence is relevant if the evidence makes it more or less probable that a criminal act occurred, the defendant was the perpetrator, or the defendant acted with the necessary criminal intent.").  In other words, victim impact

---

[2] Effective July 1, 2022, section 18-3-402(1)(a) was amended to provide that a person commits sexual assault by knowingly inflicting sexual intrusion or sexual penetration if "[t]he actor causes sexual intrusion or sexual penetration knowing the victim does not consent."  Ch. 41, sec. 1 § 18-3-402, 2022 Colo. Sess. Laws 214.

evidence is admissible only if it "tends to show the context or circumstances of the crime itself."  *Martinez*, ¶ 34 (quoting *Graham*, 650 S.E.2d at 646).

¶ 78     In *People v. Haymaker*, 716 P.2d 110, 113-14 (Colo. 1986), the supreme court held that testimony of the victim's mother that the victim was fearful and distraught for several months after she was sexually assaulted was admissible under CRE 803(3) because the statement went to the victim's state of mind.  The court reasoned that the testimony was relevant because it went to the victim's credibility that she did not consent to the sexual encounter with the defendant.  *Haymaker*, 716 P.2d at 113; *see also People v. Acosta*, 2014 COA 82, ¶ 80 (affirming a district court's admission under CRE 803(3) of a father's statement that his daughter, the victim, said that when she thought of "it" — meaning when she thought of being sexually assaulted — she was sick to her stomach).

¶ 79     Here, the description that the victims did not feel safe, sobbed, moved from their homes, were afraid, did not want physical contact, and stayed in their rooms — especially when the prosecutor generally asked how the victims felt immediately after or within days following the incidents — was relevant because it was evidence

that "tends to show the context or circumstances of the crime itself." *People v. Mena*, 2025 COA 14, ¶ 21 (quoting *Martinez*, ¶ 34); *see also State v. Cosey*, 873 P.2d 1177, 1182 (Utah Ct. App. 1994) ("Evidence of a drastic change in the victim's behavior is relevant circumstantial evidence that a traumatic experience such as rape has occurred."); *State v. Dube*, 598 A.2d 742, 746 (Me. 1991) ("Evidence of changes in the victim's personality and behavior immediately after the time of the reported assault tends to prove that something of a traumatic nature had in fact occurred and thus was clearly relevant . . . ."); *Simmons v. State*, 504 N.E.2d 575, 581 (Ind. 1987) (testimony that the victim developed a fear of going outside by herself and stayed at home more often was probative of the fact that she had been raped).

¶ 80     Unlike in *Martinez*, the prosecution did not seek to introduce the victim impact evidence to establish *why* the victims were incapable of consenting. *See Martinez* at ¶¶ 5, 38. Instead, the prosecutor's use of the emotional and psychological testimony was appropriate to rebut Whitehorn's theory of defense that he had consensual sex with each of the victims. The prosecutor did not urge the jury to convict Whitehorn because the victims had

suffered. The prosecutor tied the victims' emotional and psychological testimony to their lack of consent. Specifically, the prosecutor said in closing argument and rebuttal, "This is not simply a regretting of one night. Each one of them, in the moment, realized they did not consent to this."

¶ 81 We also reject Whitehorn's contention that the evidence was unduly prejudicial under CRE 403. The victims' emotional and psychological "responses to the incident and its aftermath were highly probative of [their] credibility, a central issue" in the case. *Mena*, ¶ 27. Any unfair prejudice from the jury sympathizing with the victims was not likely to substantially outweigh the evidence's relevance. *Id.*; *see also People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995) (Because "CRE 403 strongly favors admissibility of relevant evidence," we "afford the evidence the maximum probative value" and "minimum unfair prejudice."); *People v. Brown*, 2022 COA 19, ¶ 70 ("Unfair prejudice [in CRE 403] does not mean prejudice that results from the legitimate probative force of the evidence.").

¶ 82 Finally, we note that it was in response to defense counsel's question about P.D.'s reaction the day after the assault that P.D. said she felt numb. Defense counsel thus opened the door to the

admission of this statement. *People v. Lopez*, 2024 COA 26, ¶ 5 (holding that the trial court did not err by admitting testimony because defense counsel opened the door to the testimony by questioning the officer about the same issue) (*cert. granted* Dec. 23, 2024). The victims' testimony about their emotional and psychological trauma following the sexual assaults was minimal in comparison to their overall testimony, and it was a minor portion of the prosecution's case during a nine-day trial in which more than twenty-five witnesses testified. *See Martinez*, ¶ 43 (admission of victim impact testimony was harmless, in part, because it constituted a minor portion of the trial).

¶ 83     Thus, under the circumstances of this case, where a defendant is charged under section 18-3-402(1)(a), and the defendant's theory of defense was the victims consented to having sex with him, we discern the court did not err by admitting testimony of the victims and friends concerning the impacts the sexual assaults had on the victims immediately after or in the days following the incidents.

### C.     Investigating Officer Testimony

¶ 84     Whitehorn contends that the prosecution elicited improper screening testimony about how the officers referred cases for

further investigation because the testimony (1) suggested there was additional evidence establishing his guilt and (2) revealed the officers' personal opinion that he was guilty. Under the circumstances, we discern no error.

### 1. Additional Facts

¶ 85 At trial, the prosecution introduced the testimony of four investigators who met with the victims at the hospital, gathered information, and took their statements.

¶ 86 Investigator Nicholas Sagan (Sagan), the initial investigator in L.L.'s case, testified about what he does when investigating allegations of sexual assault. He said,

> We're trying to find out, first of all, if a crime actually occurred, does it establish the elements of the crime of sexual assault. We're looking for descriptions of suspects, you know, trying to locate a crime scene. So we want to know where it happened and if it happened in our jurisdiction. And if there is a crime scene that we need to find, we need to find the crime scene, lock it down, see if we can locate evidence at the crime scene. Perhaps get a warrant for a location, if it occurred inside of a house, an apartment, a car or something like that.

Sagan continued that he put the information he gathered from L.L. *"in the report that's submitted to a sexual assault detective for further investigation."* (Emphasis added.)

¶ 87     Investigator Brian Mudloff (Mudloff), the initial investigator in T.M.'s case, similarly testified that the purpose of his investigation is to *"[t]o determine if a crime had been committed, where* that crime was committed, *when* it was committed." (Emphasis added.)

¶ 88     Investigator Andrew Landon (Landon), the initial investigator in P.D.'s case, testified that he "conduct[s] an initial interview with [the victim], ask[s] her what happened that night. Kind of *do[es] the preliminary steps of the investigations.* So that the *case can be then sent to our sex crimes division, and they can further investigate it."* (Emphasis added.)

¶ 89     Finally, Investigator John Nelson (Nelson), the initial investigator in N.H.'s case, testified,

> You just want to get the information right away. You want to get — while it's fresh in their mind you want to get any allegations, you want to collect evidence, you want to talk — touch base with another agency, if need be, to coordinate with them so they're in coordination with our sexual assault detectives. Just to have a nice thorough investigation to find out the allegations, and if we can outsource

38

anything to them and if we need to do follow-up investigation by contacting a sex assault detective or anybody else.

## 2. Analysis

¶ 90 Whitehorn contends that the investigators' testimony describing how they conduct their investigations was improper because they implied that, through their pretrial screening process, only guilty parties are charged with crimes. The Attorney General asserts the investigators' statements were proper because they showed the "progress, sequence, and accuracy of the investigation." We disagree with Whitehorn for three reasons.

¶ 91 First, although we agree with Whitehorn that screening testimony that suggests guilt is improper, the investigators' statements here do not rise to that level. *Domingo-Gomez v. People*, 125 P.3d 1043, 1052 (Colo. 2005), and *People v. Mullins*, 104 P.3d 299 (Colo. App. 2004), held that, where probable cause to arrest or search is not at issue, it is improper to present to the jury evidence about obtaining an arrest or search warrant. Remarks of "personal knowledge, combined with the power and prestige inexorably linked with the [prosecutor's] office may encourage a juror to rely on the prosecution's allegation that unadmitted evidence supports a

conviction." *Domingo-Gomez*, 125 P.3d at 1052. But the investigators' testimony did not present evidence about how Whitehorn was arrested or how they obtained search warrants. Rather, the investigators' statements referred generally to what they did with the information they gathered from their preliminary investigations before referring the investigation to other law enforcement personnel. Thus, we conclude that the investigators' statements were not admitted for an improper purpose.

¶ 92     Second, *People v. Mendenhall*, 2015 COA 107M — on which Whitehorn relies — is distinguishable. In *Mendenhall*, a division of this court held that an investigator's testimony regarding how many potential cases he received each year was irrelevant and thus inadmissible. *Id.* at ¶ 63. Specifically, in that case, the investigator testified that he received 250 to 500 case referrals per year and described the process he undertook on each case. *Id.* at ¶ 55. Significantly, the investigator testified that not all referrals led to criminal charges but that about 35 to 50 cases a year were formally filed. *Id.* The division reasoned that "[s]uch references to a 'screening process' are improper because they hint that additional evidence supporting guilt exists that is unknown to the jury, and

40

also reveal the personal opinion of the witness as to the guilt of the defendant." *Id.* at ¶ 62. The division concluded that a reference to how many of the investigators' cases resulted in formal criminal charges was irrelevant because it had no rational tendency to make it more probable that the defendant committed the charged offense. *Id.*

¶ 93 None of the investigators in this case testified to the number of potential cases they investigated or referred for additional investigation. And none of the investigators suggested that their referrals for further investigation led to formal charges or convictions. Landon and Sagan both emphasized that their goals in their respective cases were to gather information as part of the "preliminary steps of the investigations" and then to pass their information along for further investigation by other law enforcement personnel. And Landon, Mudloff, and Nelson did not testify that they made any preliminary determinations as to whether Whitehorn's conduct constituted sexual assault. We acknowledge that Sagan's testimony that he was doing his job by moving the case forward may have suggested a specific outcome. But his testimony was not the equivalent of testimony regarding the

41

number of cases he refers for further investigation or that he is good at his job because his cases result in criminal prosecutions and convictions.

¶ 94     Third and finally, the investigators' descriptions of their investigations, the collection of evidence, and how they forwarded information to detectives for further investigation were relevant to establish the credibility and thoroughness of their investigations into the sexual assaults. Because the sexual assaults were not a single event but spanned more than a year and involved unconnected victims and different investigators, the reliability of the investigations was relevant. *See People v. Marks*, 2015 COA 173, ¶ 34 (evidence may be independently relevant to show that the police conducted a thorough investigation).

¶ 95     Accordingly, we discern no reversible error.

## V.     Cumulative Error

¶ 96     We reverse for cumulative error in criminal cases where there are numerous formal irregularities, but where none individually warrants reversal. *Howard-Walker v. People*, 2019 CO 69, ¶ 24; *People v. Roy*, 723 P.2d 1345, 1349 (Colo. 1986). But numerous errors must be committed; merely asserting numerous errors is

insufficient. *People v. Shannon*, 2024 COA 41, ¶ 34. Although we concluded that the court erred by allowing the prosecutor to engage in misconduct, we determined that such error was harmless beyond a reasonable doubt. And because we have discerned no other errors, Whitehorn's cumulative error claim fails.

## VI. Conclusion

¶ 97    The judgment is affirmed.

JUDGE LIPINSKY and JUDGE MOULTRIE concur.